RAQUEL MARGARITA PORRATA DORIA Y VEVE ET AL., Plaintiffs and Appellees, *v.* FAJARDO SUGAR COMPANY OF PORTO RICO ET AL., Defendants and Appellants.*

No. 8119.   Argued March 7, 1940.—Decided November 14, 1940.

---

* NOTE.——An appeal taken from this decision to the U. S. Circuit Court of Appeals for the First Circuit was dismissed by that court, on stipulation of the parties, in December 1941.

*Jaime Sifre, Jr.,* for appellants. *Cayetano Coll y Cuchí* for appellees.

Mr. Justice Travieso delivered the opinion of the court.

The following is a concise statement of the facts proven, which we regard as essential for the decision of this appeal.

On February 23, 1922, the plaintiffs herein, owners of two rural properties containing a total of 473.71 acres (*cuerdas*), entered into a crop-financing contract with the defendant Fajardo Sugar Company of Porto Rico, whereby the landowners bound themselves to plant and cultivate for a term of ten years or crops, beginning with that of 1923 and ending with that of 1932, a minimum area of one hundred (100) acres of cane, said cane to be annually delivered for grinding at the factory of the defendant corporation. The twenty-third clause of the deed, wherein said contract was embodied, reads thus:

"*Twenty-third.*—The Fajardo Sugar Company of Porto Rico, represented in this act by its attorney in fact and general manager, Don Jorge Bird Arias, grants to Doña María-Joaquina, Doña Luz-Delia Silvia, and Doña Raquel-Margarita Porrata Doria y Veve, likewise represented in this act by their general attorney-in-fact, Don Guillermo Oppenheimer y Salomons, a crop loan credit for ten thousand dollars, to cover the planting, cultivation, harvesting and other expenses that may be necessary for the financing and administration of the cane plantations to which this contract refers."

To secure the payment of said crop-loan credit, the debtors created a lien on the cane and sugar to be produced by the properties and mortgaged the latter for the sum of five thousand dollars.

During the fiscal years from 1922 to 1928, the Fajardo Sugar Company of Porto Rico, at the request of the plaintiffs, paid to the Insular Treasurer the taxes levied on the two properties of the plaintiffs, and charged such payment

to the account for advances. The taxes pertaining to the fiscal years 1928–1929 and 1929–1930 were not paid by the defendant corporation, although the latter had been timely requested to do so in the accustomed manner. The properties having been attached by the Treasurer of Puerto Rico for the collection of the taxes due, a public auction for the sale thereof was held on October 26, 1931. Eladio J. Candal, accountant of the Fajardo Sugar Company and also of the Fajardo Sugar Growers Association, acting in accordance with the instructions of Jorge Bird Arias, general manager of both entities, bid for and purchased the two properties in the name of the Fajardo Sugar Growers Association, paying the purchase price by a check issued by the Fajardo Sugar Company.

On December 12, 1931, subsequent to the public sale of the properties, at the request of the Fajardo Sugar Company, a new contract for advances was made, whereby that corporation granted to the plaintiffs a new credit for planting and harvesting the 1933 crop. In the deed the properties were described and it was stated that the same belonged to the plaintiffs, without any mention being made of the acquisition thereof by the Fajardo Sugar Growers Association. By virtue of said contract, and to secure the payment of the crop-financing credit, the Porrata sisters *mortgaged* their individual interests in the properties, in favor of the Fajardo Sugar Company. The certificates of purchase were issued on December 24, 1931, and recorded in the registry of property in February, 1932.

On July 19, 1932, five months and four days before the expiration of the term for redemption, Mr. Bird, general manager of the two defendant concerns, wrote a letter to the plaintiffs, stating:

"As you will see from the attached statement of account, the liquidation of the 1932 crop shows a debit balance of $17,021.53 and an additional sum of $2,915.38 for the expenses incurred in the cultivation of the ratoons or an indebtedness for advances

amounting to $19,936.91. We have made a budget of the expenses required for finishing the cultivation of the plantations for the next crop, and estimated what is to be expended for other purposes until the cutting of said cane, and the amount of said budget and expenses together with the present debt will total, at the completion of the crop, the sum of $40,000. To apply to the payment of this $40,000, we estimate that the plantation will yield a maximum of 6,600 tons of cane, and assuming that there will be a better sugar market than the present one, at the rate of $4 per ton, the value of such yield will amount to $26,400, leaving therefore a debit balance of $13,600 in the account for advances.

"On the other hand, you owe us, on mortgages amounting to $31,000, principal sum, about $11,000, as interest $6,600 of the auction sale of the properties for taxes, and an agricultural loan for $3,200, secured by your cattle and equipment, these items, making a total of $51,800. The annual interest that is, from this date until the end of the next crop, at 8 per cent, will amount to $4,100, more or less."

On January 11, 1933, the consummation of the sale made in favor of the Fajardo Sugar Growers Association was recorded in the registry; and at the request of the accountant of both defendant companies, all the liens recorded in favor of the Fajardo Sugar Company were canceled therein. On February 24, of the same year, the purchasing association instituted an unlawful detainer proceeding which culminated in the eviction of the plaintiffs.

On May 14, 1934, the Porrata sisters filed a complaint wherein they recited more in detail the facts which we have already stated, and prayed for a judgment in their favor containing the following pronouncements:

1. Decreeing the nullity of the sale made by the People of Puerto Rico to the Fajardo Sugar Growers Association, and ordering the cancellation of the certificate of said sale as well as that of its record in the registry.

2. Adjudging the Fajardo Sugar Company to pay to the plaintiff the sum of $35,000 as damages which they allege to have suffered.

3. Adjudging the Fajardo Sugar Company to charge to plaintiffs' account for advances the sum of $3,604.14, amount of the taxes paid

at the public sale of the properties; to render an account to the plaintiffs of all the transactions had between the parties under the two crop-loan contracts; and to pay the costs and attorney's fees.

The theory of the plaintiffs may be summarized thus:

Both the plaintiffs and the Fajardo Sugar Company considered that the payment of the taxes on the properties involved in the contract for advances, was a necessary expense for the administration of the cane which was cultivated in accordance with said contract; and in conformity with that interpretation, during all the time that the said contract was in force, said taxes were paid by the Fajardo Sugar Company annually and charged to plaintiffs' crop-loan account. Upon learning, through the edicts published by the Treasurer of Puerto Rico, that the taxes for the period from 1928 to 1930 had not been paid by the Fajardo Sugar Company, the plaintiffs asked the general manager of said company to advise them of the reason why such payment had not been made, and the manager informed them that the said taxes would be paid in the customary way and charged to plaintiffs' account for advances. Believing and relying on defendant's representations, the plaintiffs, as they allege, took no step to satisfy the unpaid taxes. Instead of making the payment as promised, the Fajardo Sugar Company bid at the auction sale and obtained an award of the properties for the amount of the taxes, causing the title to be transferred to its associate, the Fajardo Sugar Growers Association. Subsequent to the public sale of the properties, the plaintiffs called at the offices of the Fajardo Sugar Company to demand some information, and they were advised by the general manager of the defendant companies that the sale lacked importance, as the same had been effected for the sole purpose of protecting the interests of the plaintiffs, the amount of the taxes being charged as usual to their crop-loan account. At this last conference, the manager also advised the plaintiffs that it was necessary to renew the contract of February 23, 1922, so as to enable the plaintiffs to con-

tinue their agricultural work until the end of the 1933 crop. In the new contract for advances entered into (December 12, 1931), the plaintiffs were acknowledged to be the owners of the immovables. After the holding of the public auction and the execution of the new contract, the relations and business between the parties continued to follow their normal course, without the plaintiffs being advised in any way by the defendants of the latter's intention to claim the ownership of the plaintiffs' properties. The conduct of the defendants and the letter *(supra)* addressed by Mr. Bird to the plaintiffs, prior to the expiration of the term of one year granted by law to the plaintiffs for the redemption of the properties thus sold, led plaintiffs to believe that the properties had been purchased for their benefit, subject to the obligation on their part to reimburse the Fajardo Sugar Company for the amount of the taxes paid by the latter.

The defendants have denied the essential allegations of the complaint and especially that the Fajardo Sugar Company had bound itself in any way to pay the taxes on plaintiffs' properties. The Fajardo Sugar Company specifically denied having ever paid the said taxes or charged the amount thereof to plaintiffs' account. The Fajardo Sugar Growers Association insists that the title acquired by it is a valid one, and that it is the absolute owner of the properties purchased in its name at the public sale.

After the case was tried before the District Court of Humacao, the latter rendered judgment in favor of the plaintiffs as to the first cause of action, and consequently decreed that the properties "have never ceased to belong but still belong to the plaintiffs in this case," and ordered that the Fajardo Sugar Growers Association convey to said plaintiffs the title which it now holds to said properties and which "is declared to be void." The judgment adjudges the defendants to pay the costs, plus $5,000 as attorney's fees.

Feeling aggrieved by that decision, the defendants took the present appeal.

The appellants urge that the trial court committed eight errors, to wit:

1. In holding that the payment of the taxes was a necessary expense for the crop financing and administration of the properties.

2. In holding that Clause 23 of the contract for advances imposed on the Fajardo Sugar Company the obligation to pay the taxes levied on the properties.

3. In holding that the Fajardo Sugar Growers Association could not legally bid at the public sale of the properties, as it was estopped to do so by reason of the existing contractual ties between the owners of the properties and the Fajardo Sugar Company of Puerto Rico.

4. In holding that the award to, and acquisition of the properties by, the Fajardo Sugar Growers Association lacked legal force, as the same had been effected merely as a matter of form, the payment of the taxes having been made by the Fajardo Sugar Company, through the Fajardo Sugar Growers Association, on behalf of the plaintiffs, and charged to the latter's account for advances.

5. In weighing the evidence.

6. In holding void and nonexistent the title of the Fajardo Sugar Growers Association to the properties in litigation.

7. In sustaining the complaint as to the first cause of action and in decreeing that the properties never ceased to belong and still belong to the plaintiffs-appellees.

8. In adjudging the appellants to pay the costs and attorney's fees, and specially in fixing the amount of the latter at $5,000.

▮▮ The first two assignments raise no legal question which deserves serious consideration. We feel inclined to hold that the payment of the taxes by the owner of a property, which is subject to a contract for advances, is a necessary and indispensable expenditure for the proper administration of such property and for the protection of the interests of the owner of the immovable as well as of the crop-loan creditor. It is inconceivable that such a creditor would not be interested in the preferential payment of the taxes on the property in which the crops that secure the payment of his loan are to be planted and harvested, knowing

the preference granted by law to the People of Puerto Rico for the collection of the taxes. Even conceding that the lower court erred in holding such payment to be ''a necessary expense for administration,'' such error, in our judgment, would not be a sufficient ground for the reversal of the judgment appealed from. The error which to our mind was committed by the lower court in holding that Clause 23 of the contract for advances imposed on the Fajardo Sugar Company the obligation to pay the taxes and to charge the same to the crop-loan account, is not a ground for reversal either. The evidence shows beyond any doubt that, during the life of the contract for advances the Fajardo Sugar Company always paid the taxes when requested by the owners of the properties and charged the same to the crop-loan account, with the exception of the taxes pertaining to the two years from 1928 to 1930, when said corporation refused to make the payment in the accustomed way.

As the Fajardo Sugar Company was not legally bound to pay the taxes on the properties of the plaintiffs, we are of the opinion that there was no lawful reason precluding said corporation or its associate the Fajardo Sugar Growers Association from bidding at the auction sale, like any other bidder, or from purchasing the properties by paying to the Insular Treasury the amount due. If the bidding at the public auction had been done openly, in such manner as to make evident the firm purpose on the part of the purchaser to acquire for itself the properties offered at the public sale, we might feel compelled to hold that the title acquired by the Fajardo Sugar Growers Association is valid and uncontestable. The facts and circumstances which appear from the evidence and which we shall analyze further on, lead us unavoidably to different conclusions. The error set forth in the third assignment was undoubtedly committed; but as a mere reasoning is involved, we are of the opinion that said error is not prejudicial and that we must

disregard the same if the essential pronouncements of the judgment are supported by the law and the evidence.

We think it unnecessary to state here in detail the documentary and oral evidence introduced by the parties. We shall confine ourselves to a critical examination of that part of the evidence relating to the conduct of the parties both before and after the public sale of the properties.

We have already stated that the plaintiffs, as owners of the properties, were bound to pay the taxes, and that the Fajardo Sugar Company had not undertaken to pay them. The evidence convincingly shows that the contracting parties established the practice of having the Central pay the taxes and charge the same to the account for advances whenever it was requested to do so by the owners of the immovables, and this was done undoubtedly because it was considered to be a legitimate and necessary expenditure for the protection of the interests of both parties. It is true that the defendant corporation refused the request to pay the taxes for whose collection the sale at public auction of the properties had been advertised. Let us examine the facts which occurred subsequent to such refusal.

Mr. José Vahamonde, a witness for the plaintiffs, stated that he intervened for the purpose of attempting to settle the differences which had arisen between the Porrata Doria sisters and the Fajardo Sugar Company and went on to testify thus:

"Q. But in the conversation which you had with Mr. Bird regarding the question of the payment of the taxes at the public sale of the property, how was that conversation, what did Mr. Bird tell you regarding the possibility of the Fajardo purchasing said property at the auction?

"A. Well, that was on another occasion, that was the first time I intervened.

"Q. Please proceed.

"A. Then I returned to Fajardo three or four weeks afterwards, and mother again insisted that I should go, to talk further and so forth; I did not wish to intervene in this matter because I knew how

matters were and she could do nothing; it was only a matter of paying the amount which they owed to satisfy the debt so as to release the property, and we could not do that; by that time the property had already been sold for taxes, and I went there; one of the sisters, Raquel, the youngest one had also come from New York and one day she came to my house with a power of attorney which she had granted in my favor to represent her; I refused to accept the power of attorney and 1 said to her: 'I will help you in everything I can, but I have many things on hand, it is impossible for me'; 'No, I want you to go and talk to Jorgito Bird because they are going to sell that property for taxes and we have no money and we may lose the properties on account of the taxes'; then I went to talk to Don Jorge and explained my errand to him. I went accompanied by Augusto Márquez and he said to me: 'You tell Raquel for me that she may be assured that I am not going to keep the property for the taxes;' I do not remember whether the property had already been sold or whether this was before the auction—'That I am going to have the property purchased at the auction so as to protect the interests of the company because some other person may come in and purchase it,' and then there were these credits, which we could not satisfy, because the taxes were a dead weight on us; I then went to my cousin and told her of my efforts in the matter, but she insisted in getting a more categorical answer, a written answer or something similar; of course, I could not compel Don Jorge to give me a written statement regarding the subject of our talk, I could only resort or appeal to him as a gentleman regarding his statements to me and subsequent to that the property was auctioned off, some months afterwards; and I went there again; I do not remember for what purpose, I have business relations with the Fajardo, a contract for the planting and grinding of cane; and I do not know how it came to the knowledge of my mother that they could not grind the cane from that crop because they lacked crop-financing and other things. I then intervened and went to see the Fajardo people to find out whether they allowed me to help them with the money they needed for grinding their cane, subject, of course, to the condition that the proceeds from said cane should be paid to the Central and that I should be repaid the money expended in grinding them, inasmuch as my intervention had for its purpose the grinding of said cane, since they lacked the money to do it and we made a deal whereby the Porrata sisters would sell the property to my mother . . . .

"Q. Before that, did Don Jorge talk again about the matter of the taxes?

"A. Only on those two occasions.

"Q. You told us about the first conversation with him; when did the second conversation take place?

"A. I think that by then the property had been sold at public auction.

"Q. What did Mr. Bird tell you after the property had been auctioned off?

"A. That they did not mean to keep the property; if they got the money to refund them, they were willing to transfer the title to to them. That is all, your Honor."

Mr. Augusto O. Márquez after mentioning the steps taken by him to have the Fajardo Sugar Company pay the taxes so as to avoid the public sale continued to testify thus:

"Q. What happened on the day of the auction?

"A. I am going to tell you what happened on the day before the auction.

"Q. The day before the auction?

"A. On the day before the auction, I went to the Central to see Mr. Candal; we talked extensively regarding the possibility of his giving us that money; after talking to Mr. Candal from whom I obtained nothing, I talked to Mr. Veve and I obtained nothing from Mr. Veve either; he suggested that I should see Don Jorge again. Don Jorge was not at that moment in his office and I did not see him on that day. On the same day of the auction in the morning I visited the office and went directly to Don Jorge and I stated to him my reasons for insisting on his giving me the money for the payment of the taxes and he told me that it was impossible. In that conversation I said to Don Jorge: 'Don Jorge suppose you should order bidding for that property.'

*Judge:*

"Q. What is that?

"A. Suppose you should order bidding for that property, I said to Don Jorge and he answered: 'I am surprised that you should think such a thing of me, nothing is farther from my thoughts, because I have always meant well by that family and that is not my purpose.'

*"Plaintiffs:*

"Q. Did you say that to Mr. Bird on the day of the auction?

"A. On the day of the auction, at about half-past eight or nine in the morning.

"Q. Please proceed.

"A. After Don Jorge finally refused, I went to the office of the internal revenue collector to find out about the public sale and while there, I saw Mr. Candal who came with a check for the amount of the taxes; immediately after Mr. Candal made the payment to the collector, I went back to the Fajardo Sugar Company and made a protest to Don Jorge for the action he had taken.

"Q. And what did Mr. Bird say to you?

"A. That it was not their intention to appropriate the prop-*' erty for the taxes; that I should wait until the end of the next crop to see how it turned out and then charge that to the account; and eventually restore matters to their original condition."

The foregoing statements, which were not contradicted by any testimony of Mr. Bird, and the letter addressed by him to the plaintiffs, are to our mind sufficient to justify the conclusion reached by the trial court to the effect that the oral and written statements made by the General Manager of the Fajardo Sugar Company and the Fajardo Sugar Growers Association to the plaintiffs, led the latter to believe that the public sale of the property had been effected for their benefit and that the title to said property would be reconveyed to them upon the final liquidation of the contract for advances, subject, of course, to the refunding by them of the purchase price paid by the Fajardo Sugar Company at the auction sale.

If the intention and purpose of the agents of the defendants, in bidding at the auction sale, was to finally liquidate and close their account with the plaintiffs, by purchasing the properties in the name of one of the defendants, vesting the latter with the absolute ownership of the properties upon the expiration of the term for redemption, and cancelling all the liens constituted by the plaintiffs in favor of the Fajardo Sugar Company, why was not the preconceived plan

clearly revealed to the plaintiffs when the latter repeatedly urged the Fajardo Sugar Company to pay the taxes and charge the same to the crop-loan account, instead of leading them to believe that the defendant corporation did not intend to appropriate to itself the properties for the amount of the taxes or for the amount of an obligation which had not yet been liquidated?

If the Fajardo Sugar Growers Association participated in the auction sale merely as a bidder, quite independently of the Fajardo Sugar Company and with the purpose of acquiring for itself the properties offered for sale, why did Mr. Bird, the general manager of both entities, have to advise the plaintiffs that they owed to the Fajardo Sugar Company of Porto Rico ''$6,600 of the auction sale of the properties for taxes?'' If the Fajardo Sugar Growers Association purchased the properties in good faith for itself with funds furnished to it by the Fajardo Sugar Company, the debtor for the amount paid by the Fajardo Sugar Company at the auction should naturally and logically be the Fajardo Sugar Growers Association and not the plaintiffs. Why, then, were the plaintiffs advised that they owed to the Fajardo Sugar Company the sum of $6,600, if said sum had not been paid for their benefit? Why, then, was there charged to plaintiffs' account, as detailed in the letter from Mr. Bird, a sum paid for the benefit of the Fajardo Sugar Growers Association, when no contractual relation existed between said association and the plaintiffs?

We do not find that the lower court erred in weighing the evidence. Having examined and considered said evidence as a whole, we are led to the conclusion that the original plan of the Fajardo Sugar Company was as follows: Fearing that the Porrata Doria sisters might be unable to pay at maturity the crop-financing obligation and the mortgages constituted by them upon the properties, the managers of the Fajardo Sugar Company upon learning that the properties would be sold at public auction for nonpayment of

628

taxes, attended the auction with the purpose—which Mr. Bird had stated in his letter of July 19, 1932, and in his interviews with Mr. Vahamonde and Mr. Márquez—of purchasing the properties for the amount of the taxes, in order to avoid their acquisition by an outsider, thus protecting the interests of the owners of the immovables as well as those of the central, in its capacity as a crop-loan creditor and mortgagee. Believing that the central did not intend to appropriate to itself the properties for the amount of the taxes, the Porrata Doria sisters executed a new contract for advances, continued to cultivate the cane for the 1933 crop, and allowed the year granted by law to owners for the redemption of properties sold for taxes to lapse. Everything seems to indicate that the purpose of the company was to keep the properties for the benefit of the plaintiffs in order to reconvey the same to them upon the final settlement of the crop-loan account.

It was doubtless after the 1932 hurricane, which caused a considerable decrease in the 1933 crop, that the Fajardo Sugar Company, fearing that it might not be able to collect in full the sums owed by the plaintiffs, changed its original purpose and decided to claim for itself—or for its affiliate, the Fajardo Sugar Growers Association—the full ownership or control of the properties in question. The new *modus operandi* was indeed more speedy and summary than the original one, as it enabled the creditor company to obviate the difficulties and delays incident to a liquidation of accounts and to the judicial proceedings required for the foreclosure of the mortgage credits. We can not countenance such practices. Having elected to purchase the properties for the benefit of the parties to the contract for advances, and having by their acts and representations, before and after the auction sale, led the plaintiffs to believe that their interests were duly protected, the defendants-appellants are now estopped to change arbitrarily the legal situation originally created by them.

There is some inconsistency in the judgment rendered by the lower court. By it the Fajardo Sugar Growers Association is ordered to convey to the plaintiffs "the written title which it now holds over the properties the object of this action, which will continue to be subject to the same legal responsibilities that encumbered them at the time the title of said defendant was consummated, *which is now annulled.*" The title held by the Fajardo Sugar Growers Association can not be regarded as void. As the same was acquired by an entity with capacity to contract, after a sale at public auction which was lawfully held, we must decide that the title held by said defendant is perfectly valid, although subject of course to the liabilities resulting from the legal situation created by the acts and conduct of the contracting parties. The lower court seems to have thought that the title was void in so far as it was thereby sought to vest in the Fajardo Sugar Growers Association the absolute ownership of the properties, but that it was valid and subsistent for the purpose of its reconveyance to owners of the properties, plaintiffs herein. The judgment appealed from must be modified in this respect.

In our judgment, the applicable relief, in view of the legal situation created between the parties by the statements and acts of the defendants through their managers and agents, is the reestablishment of the *status quo* prior to the public sale of the properties by restoring the latter to their owners, plaintiffs herein, who must receive and hold them subject to the liens constituted by them and to the obligation to refund the amount paid by the Fajardo Sugar Company as the purchase price at the public sale, together with the proper interest thereon. The doctrine applicable to the case at bar is that of constructive trust.

"*Constructive Trust.*—Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.

". . . A constructive trust does not, like an express trust, arise because of a manifestation of an intention to create it, but it is imposed as a remedy to prevent unjust enrichment." Restatement of the Law-Restitution, par 160, pp. 640, 641.

"*d. Unjust enrichment and unjust deprivation.*—In most cases where a constructive trust is imposed the result is to restore to the plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him would result in a corresponding unjust enrichment of the defendant; in other words the effect is to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in the position in which he was before the defendant acquired the property . . . .

"*e. Legal and equitable remedies.*—Where property is held by one person upon a constructive trust for another, the latter has the beneficial interest therein. In many cases the beneficiary of the constructive trust can by a proceeding in equity compel the constructive trustee to transfer the property to him in specie; he is entitled to specific enforcement of the constructive trust." Restatement of the Law-Restitution, pp. 643, 644.

As we consider that the sum of $5,000 awarded by the lower court as attorney's fees is excessive, and in view of the special circumstances of the case, we are of the opinion that said sum should be reduced to $1,500.

For the reasons stated the judgment appealed from must be modified in conformity with this opinion and, as so modified, the judgment is affirmed.

Mr. Justice Wolf dissented.